32914. HEALAN *v.* HUFF, sheriff, *et al.*

Decided March 17, 1950.

*James W. Arnold, Rupert A. Brown,* for plaintiff.

*O. J. Tolnas,* for defendants.

FELTON, J. ■ The court did not err in finding that there was not a joint enterprise or adventure in the repairing of the automobile. The evidence showed that the owner of the automobile was in arrears three instalment payments when the automobile was damaged in a collision. The insurance company issued a check for the loss to the owner and the finance company. The finance company agreed that they would apply part of the check to the three past-due notes and turn the balance of $1000 over to the owner if he would agree to have the car repaired and keep up his payments. There is no evidence of an intention to enter a joint enterprise or adventure except as shown above.

There was no agreement as to joint control over the repairs, as to how, when or by whom the repairs were to be made. The finance company had a perfect right to run the risk of the car not being repaired so long as it did not knowingly prejudice the rights of another. See 30 Am. Jur. 682, 683, §§ 11, 12.

■ The court did not err in finding in favor of the finance company. It was undisputed that the owner contracted with Healan to repair the car before a representative of the finance company communicated with him. The evidence shows that after Healan had paid another mechanic $325 to do part of the work, a representative of the finance company went to his shop and talked with him about the repairs, at a time when he had done some work himself but had not finished the job. Healan testified in part: "I actually started working on the repair of this automobile myself I guess, I'd say, March 22nd because I paid Mr. Culberson on March 21st for the repairs he did. I was engaged to do the work in February sometime. I don't do frame work and I had to engage Mr. Culberson to do that and he testified what happened between me and him. After he brought it back I began work on it. It was around 2 months or more, I don't know exactly, after I got the car back from Mr. Culberson when I first saw Mr. Paul. Mr. Busbin was the man who had engaged me to do the work. I knew it was insured for the adjuster came to see me and carried my figures away and went to the Georgia Motors for when Mr. Busbin came to see me about fixing the car he said he had settled with the adjuster on a basis of the Georgia Motors estimate and told me what the amount of the check was and he had a hundred dollar deductible clause in his policy and he said the estimate from the Georgia Motors was $1100.00 and that left a thousand dollars and he asked me if I could fix it for that and I told him I thought I could, that I would take the job for a thousand dollars and hold it as close to it as I could and I called Mr. Culberson immediately and told him I had contracted for the job. He told me he had been paid by the insurance company. I believe the first time I saw Mr. Paul was in May. He came in and introduced himself to me and asked me, I believe, how I was getting along with Busbin's car and started asking questions about it and he told me the reason he was asking those questions

that he had a claim against the automobile. He did not say he had a bill of sale he said he had a claim. I asked him what it was before the conversation was over and he said it was for $1300.00. At that time the job had not been completed, it would be kind a hard to say how much it liked, it would have been quite a bit for it liked painting the car and some parts and all of the interior was still out of the car, there was quite a bit of work to do at that time. We talked on in a general way and he said well go ahead and get it finished and I will see Mr. Busbin. I never did see Mr. Busbin after I got the car, he didn't come around. The next time I saw Mr. Paul it must have been about a month, something like that, it was in June sometime and I had the job completed then all except get it cleaned up, I told him all I had to do to it was get it cleaned up ready for delivery, that I didn't want to clean it up until I knew he was going to pick it up. He never came back any more. It was in my possession when the sheriff came out there and got it, I don't believe I recall the date he got it but it was in August just shortly before I foreclosed the lien. After Mr. Paul told me to go ahead and finish it we went ahead and made a complete job out of it. After Mr. Paul made his second visit to me Mr. Busbin came out and asked me what I liked being through with it and I told him the same thing that if he was ready for it to let me know and I would get it cleaned up and ready for him and that was, I believe, on Wednesday for I told him I could have it ready either Thursday or Friday and he asked me the amount of the repair bill and I told him and he said he would be by Monday to pick it up and he asked me to take the seat covers off of it and he told me to have it ready the following Monday morning and I did and I did not see him any more. The amount of my claim is $1100.00, that is a reasonable charge and covers the parts and labor and the amount I paid Mr. Culberson. I don't recall anything like Mr. Paul telling me in the conversation we had that his claim was ahead of my lien. If I had known it was going to turn out like that I would have left it like it was, but he told me to go ahead and finish it. When I heard there was an insurance settlement to be made or had been made I didn't know there was some kind of papers on the car. Sure when Mr. Paul told me that they had a claim

on the car I knew what he had reference to. I knew that meant that he had a bill of sale or retain title on the car. I did not understand by anything that Mr. Paul said that he would waive his claim. I did not ask him about the priority of his claim over mine or my claim over his. He said nothing to indicate that his claim was prior to mine, we didn't discuss that, he just told me he had a claim on it and told me the amount but as to who would come first I didn't know enough about that to discuss those things. I don't know whether Mr. Paul went to see Mr. Busbin or not, as far as I know he did. Mr. Busbin came to see me after Mr. Paul saw me the second time. I did not ask Mr. Busbin about this claim of the Lexington Finance Corporation. I did not know Mr. Paul represented the Lexington Finance Corporation until he told me, he told me that on his first trip. Mr. Paul told me on his first trip to go ahead and finish it. I just finished it you might say on a basis of what Paul told me, I had the car there to stand good for itself. I did not have the record run as to any liens on it. I had no contract or agreement with Mr. Paul whatsoever as to the Lexington Finance Corporation being responsible for this debt. On nothing that he said did I rely upon that the Lexington Finance Corporation would waive their claim except when he left he said go ahead and finish it and I will go see Mr. Busbin. I did that based on thinking my lien was superior to his and that the car would be good for itself and on what he said too. I didn't think he was going to pull the money out of his pocket and pay me. I didn't claim that the Lexington Finance Corporation would stand aside with their claim. I would not have finished the car if Mr. Paul had told me the first time he was there that he was going to claim a superior lien over my mechanics lien. If he had told me his claim was superior to mine I would not have finished it. I didn't ask him whether his claim was superior to mine, I didn't know that much about the law, but I did know he had a claim." G. W. Paul testified in part: "I heard Mr. Healan's statement that I told him to go ahead and finish the car and I don't think I made the statement in that light, that I intended to give him authority to go ahead and finish it, I don't recall making any statement to that effect, if I made any such statement it was not with that in mind, we were

discussing Mr. Busbin's financial condition as it had been reported to us and our individual chances of collecting our debts against him and I asked Mr. Healan to keep me posted if he come and got the car and I gave him my telephone number and he said if Mr. Busbin paid him he would have to let him have the car and I told him yes I wanted him to do that but I wanted him to call me when he got it and I made no intentional statement either direct or indirectly that I was assuming any part of the obligation. After I had the first conversation with Mr. Healan I went to see Mr. Busbin, I merely went to see him about the past due instalments on his note and he agreed to get up the money and pay those, he stated that when the car was ready he would have the money to pay Mr. Healan. On my second visit to Mr. Healan I think I reported that to Mr. Healan. If Mr. Busbin was going to pay Mr. Healan off and get the car loose I wouldn't have objected for Mr. Healan to finish the job. I could have foreclosed my bill of sale the first time I went out there but I didn't do it. I knew it was out there being repaired." Assuming that the mechanic's lien was recorded in time, the judge's finding was authorized on two more theories under the evidence. He was authorized to find that the finance company was not estopped by any conduct or statements of the representative of the finance company. He was also authorized to find that if such representative did say or do anything which would have estopped the finance company from the time of such statements or conduct, the evidence did not show to what extent in dollars and cents the estoppel should apply for the reason that the evidence did not show the amount of parts and repairs put into the car subsequently to the statements or conduct of the finance company relied on as an estoppel.

The court did not err in overruling the motion for a new trial. *Judgment affirmed. Sutton, C. J., and Worrill, J., concur.*